**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SHADOW CREEK APARTMENTS, L.L.C.,
*Plaintiff-Appellee,*

v.

HARTFORD FIRE INSURANCE COMPANY,
*Defendant-Appellant.*

No. 01-2212

SHADOW CREEK APARTMENTS, L.L.C.,
*Plaintiff-Appellant,*

v.

HARTFORD FIRE INSURANCE COMPANY,
*Defendant-Appellee.*

No. 01-2251

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Margaret B. Seymour, District Judge.
(CA-00-2025-6-24)

Argued: June 5, 2002

Decided: August 22, 2002

Before MICHAEL, Circuit Judge, Robert R. BEEZER,
Senior Circuit Judge of the United States Court of Appeals
for the Ninth Circuit, sitting by designation, and
Benson E. LEGG, United States District Judge for the
District of Maryland, sitting by designation.

---

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Edward Kriegsmann Pritchard, III, PRITCHARD & BERLINSKY, L.L.C., Charleston, South Carolina, for Appellant. James Lafon Rogers, Jr., LEATHERWOOD, WALKER, TODD & MANN, P.C., Greenville, South Carolina, for Appellee. **ON BRIEF:** Paul E. Hammack, LEATHERWOOD, WALKER, TODD & MANN, P.C., Greenville, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Shadow Creek LLC (Shadow Creek) sued its insurer, Hartford Insurance Company (Hartford), seeking coverage for rent it says it lost when several of its apartment buildings, then under construction, were damaged by fires. A jury returned a verdict for Shadow Creek in the amount of $500,000, the limit of the lost rent provision of the insurance policy. The district court denied Hartford's motion for judgment as a matter of law or for a new trial. The court awarded prejudgment interest to Shadow Creek, but denied Shadow Creek's motion for attorneys' fees. Hartford appeals the denial of judgment as a matter of law and the award of prejudgment interest, and Shadow Creek cross-appeals the denial of its motion for attorneys' fees. For the following reasons, we affirm the district court's denial of judgment as a matter of law, vacate the prejudgment interest award and remand for recalculation, and affirm the denial of Shadow Creek's motion for attorneys' fees.

I.

The relevant facts of the case are not in dispute. Shadow Creek is a South Carolina company that owns property in Anderson County,

South Carolina, on which it built an apartment complex consisting of nine apartment buildings and one free-standing clubhouse. Construction on the apartment complex began in September of 1998, and the first building was scheduled to be completed in March of 1999. The apartment complex was insured by Hartford Insurance Company during construction. On January 28, 1999, Shadow Creek purchased a rider covering lost rent and soft costs for the entire complex with a total coverage limit of $500,000.[1] The lost rent rider provides, in relevant part, that Hartford "will pay for the actual loss of 'Rental Income' you sustain as a result of delay" caused by a covered loss. It further explained that "[t]he amount of 'Rental Income' will be determined based on: (1) the Net 'Rental Income' of similar rental properties before the direct physical 'loss' occurred; [and] (2) the likely Net 'Rental Income' of the property if no 'loss' occurred."

On February 1, 1999, a series of fires burned several of the buildings. One of the buildings was completely destroyed, two were severely damaged, and three were somewhat damaged. The cause was arson. One of the arsonists, a volunteer fireman, was apprehended and convicted, and none of the Shadow Creek principals were implicated in any way. Roughly speaking, the nine apartment buildings were scheduled to be completed on a staggered basis between March and August of 1999. Because of the delay caused by the fires, the first building (Building 9) was not completed until mid-May of 1999 and the other buildings were completed on a staggered basis mainly from July of 1999 to January of 2000.[2] Hartford reimbursed Shadow Creek

---

[1]For the sake of brevity we will refer to this rider as covering "lost rent," but we acknowledge that it also covers soft costs associated with such lost rent. Soft costs are costs such as architectural fees and refinancing costs. The parties stipulated to the amount of soft costs; this case concerns only the amount of lost rent.

[2]Even though only some of the buildings were damaged by the fires, construction on all nine buildings was delayed. The buildings' originally scheduled completion dates and the actual completion dates after the fires are as follows:

|  | Scheduled completion: | Actual completion: |
| --- | --- | --- |
| Bldg. 1: | March 1, 1999 | January 13, 2000 |
| Bldg. 9: | March 26, 1999 | May 15, 1999 |

for much of its loss, and the parties do not dispute the reimbursement amount except for the amount of lost rent. Hartford calculated the lost rent at $200,000 and sent Shadow Creek a check in that amount.[3] Shadow Creek estimated its lost rent at about $527,000 and submitted a claim for $500,000, the policy limit. Hartford denied this claim, and Shadow Creek brought this suit in South Carolina circuit court to compel payment of the claim. Hartford removed the case to federal district court based on diversity of citizenship. Both parties agree that South Carolina law controls.

After a three-day trial, the jury returned a verdict for Shadow Creek in the amount of $500,000, the policy limit. The parties had entered into an agreement whereby any jury verdict on the total amount of lost rent would be reduced by the $200,000 already paid by Hartford, so the district court entered judgment in the amount of $300,000. The court awarded Shadow Creek prejudgment interest at the statutory rate calculated from February 1, 1999, the date of the fires. Hartford moved for judgment as a matter of law or for a new trial, and the court denied this motion. Shadow Creek moved for attorneys' fees, arguing that Hartford unreasonably denied the claim. The district court denied this motion as well. Hartford appeals the denial of judgment as a matter of law and the award of prejudgment interest, and Shadow Creek cross-appeals the denial of attorneys' fees.

## II.

| Bldg. 8: | April 23, 1999 | July 13, 2000 |
| Bldg. 7: | May 14, 1999 | July 10, 1999 |
| Bldg. 6: | June 11, 1999 | July 31, 1999 |
| Bldg. 4: | July 23, 1999 | October 15, 1999 |
| Bldg. 5: | July 23, 1999 | October 2, 1999 |
| Bldg. 3: | August 13, 1999 | December 15, 1999 |
| Bldg. 2: | August 21, 1999 | January 13, 2000 |

For reasons that are not clear, Building 8 was not completed until July of 2000, but Shadow Creek attributed only about eight months of this 15-month delay to the fires. Hartford does not dispute this aspect of the loss calculation.

[3]Specifically, Hartford estimated $138,744.86 in lost rent and $61,255.14 in soft costs, for a total of $200,000. As noted above, the parties dispute only the amount of lost rent.

We first address Hartford's argument that the district court erred in denying its motion for judgment as a matter of law. We review the district court's decision de novo, taking the facts in the light most favorable to Shadow Creek, the non-moving party. *Baynard v. Malone*, 268 F.3d 228, 234-35 (4th Cir. 2001). "The question is whether a jury, viewing the evidence in the light most favorable to [Shadow Creek], could have properly reached the conclusion reached by this jury." *Benesh v. Amphenol Corp. (In re Wildewood Litigation)*, 52 F.3d 499, 502 (4th Cir. 1995). As noted above, the parties do not disagree about the relevant facts of this case; rather, they disagree about the meaning of "actual loss of rental income" as applied to those facts. The disparity between Hartford's lost rent estimate and Shadow Creek's estimate does not stem from disagreements on estimated occupancy rates, rent amounts, or the like, but from the methods used to calculate the loss. Essentially, Hartford argues that its method of calculating lost rent was correct as a matter of law given the facts presented. We will first lay out Shadow Creek's method of calculating its loss and then turn to Hartford's method, which is somewhat more complicated and requires some discussion.

Shadow Creek calculated its lost rent as follows. Based on stabilized occupancy rates of similar completed buildings in the area, Shadow Creek assumed a 92 percent occupancy rate. It then calculated the amount of rent it would have received at 92 percent occupancy for each of the nine buildings during the length of time that the completion of each building was delayed. Take Building 1 as an example: a delay of 10 months 13 days multiplied by $11,776 rent per month (at 92 percent occupancy) equals $122,662.89 in lost rent.

Hartford's calculation was significantly different. First of all, Hartford did not calculate the month-by-month loss of rent using a 92 percent occupancy rate. It did not contest the assumption that the stabilized occupancy rate would likely be about 92 percent. Rather, it rejected the notion that the stabilized occupancy rate was the relevant occupancy rate for the purpose of calculating this loss. Both parties agreed that the Shadow Creek Apartments, like many apartment buildings, would not for the most part reach maximum occupancy as soon as they opened, but would experience a gradually increasing occupancy rate over a period of months until, at some point, the occupancy rates stabilized at around 92 percent. Thus, for each building

Hartford calculated Shadow Creek's lost rent according to Shadow Creek's own estimates of its expected occupancy rates — about 35 percent occupancy for the first month opened, 66 percent for the second month, and so on. Shadow Creek's managing member, Woodrow Wilson, admitted on cross-examination that Shadow Creek would not have received 92 percent occupancy rates on all nine buildings as soon as they opened.[4] The parties do not dispute that "actual loss of rental income" means the amount of rental income that Shadow Creek would have received if the fires had not occurred but did not receive because of the fires. Because Shadow Creek admits that it would not have received rental income at a 92 percent occupancy rate for each of the nine buildings as soon as they opened, we agree with Hartford that Shadow Creek is overestimating its loss of rental income, at least during the first months of its loss on each building. There was no evidence presented from which a reasonable factfinder could conclude that absent the fires, Shadow Creek would have received rental income at a 92 percent occupancy rate for each building as soon as it opened. Rather, Hartford is correct to use Shadow Creek's estimated occupancy rates, which gradually increased over time towards occupancy stabilization. We will return to this conclusion later in the opinion to address its impact on our ultimate holding. For now, we turn to the other important aspect of Hartford's lost rent calculation.

In addition to using a gradually increasing occupancy rate instead of a 92 percent rate from day one, Hartford also ended any recovery for lost rent as of July 31, 1999, even though the apartment buildings opened on a staggered basis roughly from May of 1999 to January of

---

[4]The exchange was as follows:

Q:    But had there been no fire would you have leased those buildings at a ninety-two percent occupancy rate the day they opened up?

A:    [Wilson]: The first three buildings would have been probably in that range, and then it would have dropped off through the rest of the property.

Q:    But you haven't done that [in your calculation] there, have you? You've [calculated] it for all nine buildings [at] ninety-two percent the day it would have opened?

A:    [Wilson]: That's correct.

2000. Hartford reasoned as follows. When the first building (Building 9) opened in May, it was fully occupied immediately. Likewise, when the second building (Building 7) opened, it was fully occupied.[5] When the third building (Building 6) opened on July 31, 1999, it was not completely occupied. As the other buildings were completed, from July 31 on there were *always* available rental units in at least one of the completed buildings.[6] Hartford argues that as soon as Shadow Creek had available rental units that were sitting vacant, as a matter of logic it suffered no further loss of rental income. The fact that there were apartments available for rent conclusively demonstrates, Hartford argues, that even if the other buildings had been up and running as initially scheduled, Shadow Creek would not have been able to rent any more units than it actually rented. The idea is that the presence of vacant rental units demonstrates that there were no renters who would have rented but for the arson — if they would have rented, they would simply have filled up the vacant units. Thus, Hartford argues, Shadow Creek did not lose rental income after July 31, 1999, because of the arson.

Hartford claims that this method of calculating Shadow Creek's lost rent is correct as a matter of law because it follows necessarily from the meaning of "actual loss of rental income" in the policy. The principle on which Hartford relies — that supply in excess of demand precludes any claim for lost income — does have support in the case law. For example, in one case a cement manufacturing plant was shut down by a fire. *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir. 1966). The plant produced

---

[5]The parties agreed that, generally speaking, occupancy rates would start low and gradually increase, as described above. However, they also agreed that the first one or two buildings to open would probably be immediately filled, as there would be an initial period of high demand. As Wilson put it, "It's not uncommon in the first building if you've done pre-leasing to be able to have that building leased out or at least ninety-two [percent occupancy] — that is not uncommon. . . . The rest of the complex we didn't project it to be leased out [at full occupancy immediately]."

[6]There was a period between August and December of 1999 when no one-room units were available, so Hartford included payment for lost rent on one-room units during that period.

clinker, an ingredient used to make cement. The business had a large stockpile of both finished cement and of clinker, so it was able to meet all customer demand while the factory was down. *Id.* at 532-33. Because the company had inventory in excess of customer demand, the Eighth Circuit held that it had lost no income because of the fire and was not entitled to insurance proceeds for lost profits.[7] *Id.*; *see also Lyon Metal Prod., LLC v. Protection Mutual Ins. Co.*, 747 N.E.2d 495, 505 (Ill. App. Ct. 2001) ("[I]f there is enough inventory to meet the projected sales for the period of interruption there is no loss of earnings.").

The principle that a plaintiff cannot recover for lost profits when it has inventory in excess of demand is based on several assumptions. Among other things, the principle asks us to assume that the loss of inventory has not affected consumer demand. If the loss reduced not only supply but also consumer demand, then of course we could not assume that the level of demand after the loss occurred reflects what demand would have been absent the loss. In *Northwestern States Portland Cement* there was no reason to think that customer demand for cement was lower because of the fire at the plant. Thus it was reasonable to assume that had the fire not occurred, Portland Cement would not have sold more cement. In this case, Hartford's argument rests on the assumption that the actual demand for apartments in the Shadow Creek complex on July 31, 1999, was the same as what the demand would have been on July 31 absent the fires.

The uncontested facts in this case render this assumption questionable to say the least. As explained above, both parties agree with the general proposition that the Shadow Creek apartment complex would not immediately reach its stabilized occupancy rate. Rather, as each building opened, occupancy rates would slowly increase until at some point the rate stabilized at around 92 percent. At oral argument, Shadow Creek referred to the time between the initial opening of an apartment building and the point at which occupancy stabilizes as the "ramp-up period," and we think this is as good a term as any to

---

[7]There is a difference between coverage for lost profits and coverage for lost rent. A lost profits provision covers income less expenses, whereas a lost rent provision simply covers income. This difference is not relevant to our analysis, so we discuss the two interchangeably.

describe this period. Presumably, the ramp-up period exists because demand for apartment units is spread out over time. Over the course of a year, there may be 200 people interested in renting a Shadow Creek apartment, but not all 200 will want to move in on the first day the apartments are available. Thus, when the apartment buildings were delayed in opening, the ramp-up period — the period of gradually rising occupancy rates — was also delayed. Because of the delay caused by the fire, on July 31 Building 6 was experiencing the beginning, low-occupancy stage of the ramp-up period. If Building 6 had opened on June 11, as planned, by July 31 it would have been seven weeks further along in the ramp-up period. In August, instead of getting rents at the Month 3 occupancy rate, Shadow Creek got rents at the lower Month 1 occupancy rate. This type of loss, caused by delaying the opening of a business, was recognized by the Georgia Court of Appeals in *Chronicle Bldg. Co. v. New Hampshire Fire Ins. Co.*, 94 S.E. 1043 (Ga. Ct. App. 1918). In that case, the court observed that "losses [in the form of lost rent] . . . might accrue by reason of necessary delay attendant upon the retenanting of the building subsequently to such period after its actual reconstruction." *Id.* at 1044. The court recognized that when an apartment building is damaged and must be rebuilt, the owner will probably lose rent not only while the apartment building is being reconstructed, but also after it opens during the period of time it takes to return the building to its stabilized occupancy rate.[8] In this case, a reasonable jury could have found that the demand for Shadow Creek's apartments on July 31 and thereafter was lower than it would have been absent the fires because the fires delayed the ramp-up period. Thus the district court properly denied Hartford's motion for judgment as a matter of law seeking to cut off all recovery after July 31, 1999. On the facts presented, a reasonable

---

[8]The court in *Chronicle Building*, while recognizing that the insured might actually suffer lost rent in this manner, denied coverage because the policy expressly limited lost rent recovery to "the necessary period of reconstruction." Thus, losses occurring after reconstruction was finished, whether actually incurred by the insured or not, were not covered under the policy. *Id.* This case is similar to *Chronicle Building* except that the policy here contains no language limiting actual lost rent to the time period during construction.

jury could determine that Shadow Creek continued to suffer loss of rental income even after it had vacant units available for rent.[9]

We concluded above that Shadow Creek's method of calculating its loss resulted in overestimating its loss during the period of delay for each building. This is because Shadow Creek assumed a 92 percent occupancy rate immediately for all buildings, which Shadow Creek admits would not have actually happened. Rather, the evidence supports the conclusion that Shadow Creek lost rent at a lower amount per month than Shadow Creek claimed. But both Hartford and Shadow Creek are underestimating Shadow Creek's loss of rental income *after* each building opened — Hartford by cutting off loss as soon as rental units were available in any unit, and Shadow Creek by not claiming any lost rent on each building after that building opened. The evidence supports the conclusion that Shadow Creek's losses continued after each building was completed. This is because the effect of the delay in the ramp-up period continued even after each building had opened. For example, Building 6 opened July 31. By September, Shadow Creek was still losing rental income on Building 6 even though it had been open for over a month. In September Building 6 had Month 2 occupancy rates when without the fires it would have had Month 4 occupancy rates. Not only did Shadow Creek lose rental income on each building during that time *before* each building opened, but it continued to lose rental income *after* each building opened. The losses ceased only when the occupancy rate stabilized at 92 percent. It is only at this point that one can confidently say that

---

[9]Hartford's position rests on yet another assumption that is questionable in this case, namely that the goods in question are fungible. The principle assumes that customers will be content to receive the excess inventory in place of the inventory that was destroyed. But apartments are not generally considered fungible. If a potential lessee had his heart set on a third-floor, south-facing apartment, he may not be willing to rent a vacant apartment on the first floor that faces north. The vacancy in the first-floor north-facing apartment does not necessarily imply that there is no demand for the third-floor south-facing apartment. Hartford claims that these particular apartments were interchangeable and that Shadow Creek presented no evidence to the contrary. We need not resolve this issue because Hartford's argument fails on the independent ground, discussed above, that the loss can reasonably be said to have reduced demand by delaying the ramp-up period.

Shadow Creek was renting its units at the same rate that it would have been renting them absent the fires. Accordingly, while we observed above that Shadow Creek is overestimating its actual losses during the period of each building's delay, Shadow Creek is likewise underestimating its actual losses during the period following each building's completion.

Interestingly, Shadow Creek's method of calculating the loss and the method we have described above are equivalent — they yield the exact same loss amount. That is, Shadow Creek would have lost the same amount of money whether it lost several month's rent on all of its apartments operating at their stabilized occupancy rates or whether the apartments were delayed the same number of months during construction. In either case, Shadow Creek loses an amount equal to its revenue at its average maximum capacity for the period of the shutdown.[10] The difference is that when the shutdown occurs at the opening of a business rather than after the business is established, the loss, while equal in amount, is simply spread out over a longer period of time. Thus, even though we agree with Hartford that the evidence does not support the conclusion that Shadow Creek lost rent at a 92 percent occupancy rate in the first months, we are able to affirm the

---

[10]Showing how this principle works using one of the actual buildings in this case would involve irregular figures and thus would not provide a clear illustration. For clarity's sake, we use imaginary Building A as an illustration. Assume that Building A was delayed by three months, and that Building A would experience occupancy rates of 25 percent the first month, 50 percent the second month, 75 percent the third month, and 100 percent the fourth month and thereafter. If Building A has $4000 in rent at full occupancy, then the lost rent in month one would be $1000, since it expected 25 percent occupancy ($1000 in rent) but had zero occupancy because of the delay. The losses for the following months would be: $2000 in month two, $3000 in month three, $3000 in month four, $2000 in month five, $1000 in month six, and no loss in month seven. The loss levels off in month four and declines thereafter because by month four Building A has opened and is being occupied, just at a lower level than it would have absent the delay. These figures, added together, yield a total loss of $12,000 over six months. This is the same total loss as the total loss assuming full occupancy for the three month period of delay: $4000 x 3 = $12,000.

district court's denial of Hartford's motion for judgment as a matter of law.[11]

## III.

Apart from the court's denial of its motion for judgment as a matter of law, Hartford appeals the district court's calculation of prejudgment interest. Shadow Creek, for its part, appeals the district court's denial of its motion for attorneys' fees. We address these issues in turn.

## A.

The district court awarded Shadow Creek prejudgment interest starting on February 1, 1999, the date of the fires. Hartford argues that even assuming that the damages award is justifiable, the district court should not have calculated interest starting at the date of the fires. First, Hartford claims that interest does not begin to accrue on the date of the loss, but rather 60 days after the loss. Second, even if interest begins on the date of loss rather than 60 days after the loss, Hartford argues that Shadow Creek's loss of rental income did not occur on the date of the fires, but rather on the date that each building was scheduled to open. We address these contentions in turn.

Hartford is correct that ordinarily prejudgment interest does not begin on the date of loss but only after some reasonable period (usually 60 days) following the loss. This 60 days represents the time that the insurer is given to investigate the loss and make a coverage deter-

---

[11]Because these two methods of calculating lost rent result in the same total figure, it may seem that we are being hyper-technical to draw the distinction. The method we have described for calculating lost rent, however, is necessary to make sense of the competing claims in this case (in addition to simply being technically correct). Our method explains why Shadow Creek's ultimate loss figure is correct even though Hartford is obviously right when it points out that Shadow Creek did not, in fact, lose rental income at a 92 percent occupancy rate during the first few months that each building would have been open. While Shadow Creek did not lose rent in that manner, the amount of its actual loss of rental income is the same as if it had.

mination. However, in *Flynn v. Nationwide Mut. Ins. Co.*, 315 S.E.2d 817, 821 (S.C. App. Ct. 1984), the South Carolina Court of Appeals held that when the insurance company denies a claim and must be sued before it will pay, the court will compute interest starting on the date of loss, not on the date that the payment was demandable by the insured. Likewise, in *Varnadore v. Nationwide Mut. Ins. Co.*, 345 S.E.2d 711, 715 (S.C. 1986), the South Carolina Supreme Court cited *Flynn* with approval and affirmed the trial judge's computation of interest starting at the date of the loss. Accordingly, as we read South Carolina law, prejudgment interest for an award of insurance coverage is computed from the date of the loss, absent contractual language to the contrary.[12]

Even assuming that prejudgment interest accrues from the date of the loss rather than 60 days after the loss, Hartford argues that the district court erred in determining when the loss actually occurred. As stated above, the district court set the date of loss as February 1, 1999, the date of the fires. Hartford argues that the lost rent (which is the only loss at issue here) did not occur until, at the very earliest, the date when the apartment buildings would have opened absent the fires. Hartford argues that interest should begin running on each building based on the date when each would have opened (i.e., Building 1 on March 1, 1999, Building 9 on March 26, 1999, and so on). We agree with Hartford on this point. Shadow Creek did not suffer

---

[12]Hartford cites *Jacobs v. American Mut. Fire Ins. Co. of Charleston*, 340 S.E.2d 142 (S.C. 1986), for the proposition that interest begins 60 days after the loss occurs rather than on the date of the loss. Indeed, in *Jacobs* the South Carolina Supreme Court did affirm the trial court's computation of interest starting 60 days after the loss occurred. *Id.* at 143-44. But in *Jacobs* only the insurer appealed the interest computation. The Court rejected the insurer's appeal, noting that the trial court's computation was actually "more favorable to the Insurer than the rule enunciated in *Flynn*." *Id.* at 144. Because the only error in the trial court's ruling benefitted the insurer, and because only the insurer appealed, the Supreme Court simply affirmed the trial court's judgment. If the insured had cross-appealed the interest award, the Supreme Court would undoubtedly have corrected the trial court's error and instructed that the interest be calculated from the date of the loss. *Jacobs*, like *Varnadore*, clearly adopts the rule articulated in *Flynn*, namely that interest is calculated from the date of loss.

a loss of rental income on February 1, 1999, the date of the fires. Instead, Shadow Creek's loss of rental income for each building did not begin until each building was originally scheduled to open. Accordingly, we vacate the district court's prejudgment interest award and remand for recalculation. On remand, the district court should calculate interest on a building-by-building basis, using the scheduled opening date of each building as the date on which Shadow Creek's loss of rental income for that building occurred.[13]

### B.

Finally, Shadow Creek appeals the district court's denial of its motion for attorneys' fees. Attorneys' fees are available in South Carolina when the insurer denies a claim in bad faith or without reasonable cause. S.C. Code Ann. § 38-59-40. Shadow Creek primarily takes issue with a several month delay in reconstruction that it says was caused by unreasonableness on the part of Hartford. Hartford's adjustor, Sanford, maintained for several months that the concrete slabs beneath Buildings 1 and 2 were repairable. Finally, after several months he conceded that they were not repairable and that the buildings had to be completely rebuilt. Shadow Creek presented Sanford's own computer log as evidence of unreasonableness. In the log San-

---

[13]Actually, Shadow Creek did not lose all of its rental income for each building on the first day that each building was scheduled to open. Rather, it lost rental income on a month-by-month basis, as it would have received the rent. For example, on Building 1 Shadow Creek lost one month's rent at 35 percent occupancy for March, one month's rent at 66 percent occupancy for April, and so on. Nonetheless, we will not instruct the district court to separate the loss out on a month by month basis for the purpose of calculating interest separately for each month of lost rent. While Hartford contested the February 1 date of loss, it requested (both in its brief and in oral argument) only that the loss be allocated to the date of each building's scheduled opening, not that it be separated out for each month. Calculating the interest separately for each month of rent would undoubtedly be quite complicated and would not yield a figure significantly lower than calculating the interest for each building from the date that building opened. Because Hartford requests only that the interest on each building's rent be calculated from the date that building was scheduled to open, the district court is free to do just that.

ford apparently had noted as early as a week after the fires that these slabs were "totaled."

Even if we accept Shadow Creek's version of events, it is not entitled to an award of attorneys' fees here because the attorneys' fees were not expended as a result of the allegedly unreasonable behavior. Hartford paid to have the buildings rebuilt, and Shadow Creek did not have to sue them to recover for the rebuilding. Thus, Shadow Creek incurred no attorneys' fees that are in any way related to the delay attributable to Sanford's behavior. The only question with regard to attorneys' fees is whether Hartford's denial of the lost rent in excess of $200,000 was in bad faith or was unreasonable, because that is the only issue over which any attorneys' fees were expended. *See Taylor v. Nix*, 416 S.E.2d 619, 622 (S.C. 1992) (statutory attorneys' fees cannot be recovered for fees spent on matters unrelated to the claim for which a fee award is authorized). While we have affirmed the judgment against Hartford, its reason for denial of the extra lost rent was both factually and legally supportable. We therefore affirm the district court's denial of attorneys' fees.

## IV.

In sum, we affirm the district court's denial of Hartford's motion for judgment as a matter of law or for a new trial. We vacate the district court's prejudgment interest award and remand for recalculation. Finally, we affirm the district court's denial of Shadow Creek's motion for attorneys' fees.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*